**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Rosemarie Redford as Personal Representative of the Estate of Bryan Neal; and Rosemarie Redford on Behalf of all the heirs of Bryan Neal, | ) ) ) ) ) | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:13-cv-014 |
| Willbros Group, Inc. and Willbros Construction (U.S.), LLC, | ) ) ) | |
| Defendants. | ) | |

This is an action brought by Rosemarie Redford as the personal representative of the estate of Bryan Neal and on behalf of Neal's heirs. The heirs assert a statutory claim for wrongful death and the estate a survival claim. Before the court is defendants' motion for summary judgment. Unless otherwise indicated below, the facts are stated most favorably for plaintiffs.

## I.   BACKGROUND

### A.   The Willbros RV park

Defendant Willbros Construction (U.S.), LLC ("Willbros") is headquartered in Houston, Texas. It specializes in the construction of oil and gas pipelines. To support its work in western North Dakota, Willbros maintains an office/shop complex and pipe storage yard in rural McKenzie County just south of Watford City, North Dakota.

Because of the shortage in housing in western North Dakota due to the oil boom, Willbros created a small RV park adjacent to its office/shop complex as one of its solutions for providing

housing for its workforce.[1]  The RV park had spots for approximately fifteen RVs for which Willbros provided connections for utilities (electricity, sewer, and water) and a dumpster for trash. Willbros also made available limited laundry and shower facilities in its adjacent shop.  At the time of the events relevant here, there was no fence or other barrier between the RV park and the office/shop and pipe yard.  However, there was a separate entrance for vehicles as well as driving lanes to access the RV hookups and room for parking tenant vehicles.

The Willbros employees residing in the park were required to sign a rental agreement, which set forth the rental policies and the park rules, and to pay $500 per month rent.  The decedent Bryan Neal was a tenant of the RV park at the time of his death and the version of the rental agreement that he signed was the following:

**WILLBROS RV PARK**
**RENTAL POLICY AND PARK RULES**

1.  LOT RENT IS $500.00 PER MONTH DUE ON THE 1st OF EACH MONTH.
2.  PAYMENTS MUST BE MADE TO: WILLBROS (CHECK OR MONEY ORDERS ONLY)
3.  I/WE GIVE WILLBROS AUTHORIZATION TO GARNISH ANY AND ALL LOT RENT THAT IS PAST DUE OR OWED TO WILLBROS FROM THE WEEKLY PAY CHECKS.
4.  ALL PAYMENTS MUST BE TURNED IN TO *LISA KURGAN*.
5.  THERE IS A 5 DAY GRACE PERIOD, AFTER WHICH THERE IS A $30.00/WK LATE CHARGE.
6.  WILLBROS IS NOT RESPONSIBLE FOR PROPERTY DAMAGE OR INJURIES INCURRED ON THE PREMISES.
7.  TENANT IS RESPONSIBLE FOR ANY DAMAGE TO WILLBROS PROPERTY INCLUDING ELECTRICAL AND PLUMBING FIXTURES.
8.  TENANT IS REQUIRED TO WINTERIZE THEIR RV'S TO THE EXTENT TO PROTECT THE WATER AND SEWER SYSTEMS.
9.  TENANTS ARE NOT ALLOWED TO LEAVE WATER RUNNING INSIDE OR OUTSIDE OF THE RV AT ANY TIME.
10.  ALL TENANT'S [sic] WILL USE THE NORTH DRIVEWAY. THE SHOP, PIPEYARD AND OFFICE AREA IS OFF LIMITS TO ALL

---

[1]  During the same time frame, Willbros rented 21 guest rooms, two apartments, and six RV sites at a motel in nearby Alexander, North Dakota, for additional housing.

TENANTS/EMPLOYEES UNLESS THEY ARE ON THE CLOCK AND DURING WORKING HOURS.

11. ALL TENANTS MUST ABIDE BY THE 10MPH SPEED LIMIT IN THE PREMISES.
12. QUIET HOURS ARE FROM 10PM TO 5AM. (NO EXCEPTIONS)
13. ALL VEHICLES WILL BE LICENSE [sic], INSURED AND DRIVEABLE. (3 MAXIMUM PER LOT)
14. NO PERMANENT STRUCTURES OR BUILDING ARE ALLOWED ON THE PREMISES.
15. ALL TENANTS MUST KEEP PETS ON A LEASH AT ALL TIMES AND MUST CLEAN UP AFTER THEM.
16. ALL TENANTS WILL BE RESPONSIBLE FOR KEEPING THE PREMISES AND AREAS AROUND THEIR RV NEAT, CLEAN, FREE OF TRASH AND EQUIPMENT ETC.
17. TENANTS ARE PERMITTED TO RECEIVE PERSONAL MAIL/PACKAGES AT THE OFFICE. BUT MUST BE PICKED UP DAILY, WILLBROS WILL IS [sic] NOT RESPONSIBLE FOR LEFT MAIL/PACKAGES.
18. ALL TENANTS MUST BE LISTED ON THE RENTAL AGREEMENT AND ARE REQUIRED TO FOLLOW ALL RULES WHILE ON PREMISES.
19. ALL TENANTS ARE RESPONSIBLE FOR THE ACTIONS OF THEIR VISITORS WHILE ON THE PREMISES.
20. ANY TENANT RECEIVING UP TO 3 WARNINGS DUE TO VIOLATION OF PARK RULES WILL BE EVICTED FROM THE PREMISES.

WILLBROS SIGNATURE: _____ DATE:_____
TENANT SIGNATURE:_____ DATE:_____
TENANT SIGNATURE:_____ DATE:_____

(Doc. Nos. 31-12 & 31-60, p. 13).

The record is unclear as to exactly how the park policies were developed. However, there is some evidence suggesting that, because Willbros does not normally get involved in providing workforce housing and this was an exception due to the severe housing shortage, the responsibility for setting up and operating the RV park fell to the area manager and his staff and that one or more of his staff looked on the internet for ideas of what to include in the park policies.

**B.    The after-bar-closing party**

During the early morning hours of Tuesday, August 14, 2012, and after the bars had closed at 1:00 a.m., several of the RV tenants, along with others who were not residing in the park, retired

to the park to continue drinking and "partying." Most, if not all, of the group had been at the Eagles Club in Watford City until closing. The group included at least four Willbros employees: Thomas Stillwagoner; Jake Swartz; Hunter Rhodes; and the decedent, Byran Neal. However, it is possible there may have been one or two others. Of these four employees, only two were tenants of the park, Stillwagoner and Neal. Swartz and Rhodes were staying elsewhere, although Swartz planned on spending that evening in Neal's RV.

The "party group" also included Emily Envid, the bartender from the Eagles, who was invited to attend. There is also evidence that one or more other Eagles employees may have been in attendance.

Several of the Willbros employees who came from the Eagles had been there since early evening, drinking beer interspersed with shots of hard alcohol. There is evidence they were alcohol impaired even before the after-bar-closing party began at the RV park. In fact, one of the Willbros employees, Don Huffman, who had been part of the group in the bar never made it back to the RV park at closing with the others. He was arrested for an alcohol-related driving offense shortly after 1:00 a.m upon leaving the Eagles Club. The test for his blood alcohol level came back at 0.198 g/100ml, which is more than twice the 0.08 percent by weight at which a person is prohibited from driving or being in control of a motor vehicle under N.D.C.C. § 39-08-01(1).

Upon arrival at the RV park, the party group gathered at the back end of Rhodes' pickup, which he had parked perpendicular to (with the front end facing) Stillwagoner's RV. The tailgate was placed down and on it was placed a cooler of beer. Several lawn chairs were also set out and the group proceeded to drink beer and pass around a bottle of whisky until it was fully consumed. There is also evidence that there was music on.

Aside from what might be surmised from the number of persons present (at least half of whom were non-tenants), the prior drinking and impaired state of several of the participants when the gathering began, the time of day, the continued drinking, and the playing of music, there is also other evidence of a "party atmosphere." At least two of the RV tenants who were not involved have stated they were able to hear the noise outside and were aware of the group drinking within the park. In particular, Charles Burgess testified that he awoke when the group from the Eagles first arrived, having heard the vehicles pull up and the initial commotion, and went outside for a cigarette. The words he used to describe what was going included: "party;" "clowning around, laughing;" and "goofing off." (Doc. No. 31-53, pp. 26-31).

There is also evidence (in addition to the events surrounding Neal's death that are described in a moment) that many of the party group continued to drink to the point of obvious drunkenness and intoxication. In response to a question about how drunk Rhodes was that night, Stillwagoner testified during his deposition:

> A.    Oh, I'd say all of us were pretty drunk. I mean he wasn't the only one out of all of us that was - - well, I'd say we were wasted - -
>
> Q.    Okay.
>
> A.    - - you know. We - - we drank a lot that night - -

(Doc. No. 31-54, p. 41). In addition, Burgess, who had earlier witnessed the commencement of the party but did not become involved, testified that sometime later Neal called and requested he go into town to bail out Huffman. After he did so and upon his arrival back at the RV park, he witnessed the argument that had broken out between several of the Willbros employees and Rhodes that is described in more detail below. He also observed, Emily Envid, the bartender from the Eagles,

seated in the passenger's seat of a pickup banging her hand on the window in an apparent state of intoxication.

**C.**     **The events leading up to and including Neal's death**

At some point during the party, the topic of Rhodes wanting to sell a pistol came up. Stillwagoner testified he had discussed purchasing the pistol from Rhodes earlier and thought he had a deal. However, after the topic came up, Neal started bidding on the pistol, and there is some suggestion Rhodes continued to up the price. While this was being discussed, the weapon was taken out and passed around. Stillwagoner claims he later returned the pistol to the center console of Rhodes' pickup after Neal and Rhodes were unable to agree upon a price because of his concern of an accidental discharge as a result of the drinking. (Doc. No. 31-54, pp. 20-23).

Rhodes later decided to leave. Exactly when is not clear, but it appears to have been close to 3:00 a.m. After Rhodes backed away from where he had been parked, he returned claiming someone had stolen his pistol. The other Willbros employees attempted to persuade him this was not the case and that the pistol must simply have been misplaced. An effort was made to search for the gun and there is some evidence it was located trampled in the grass near where the pickup had been parked. How it got there is not clear.

In any event, a heated discussion then ensued with Rhodes still claiming that someone had attempted to steal his gun and the others including Neal, Swartz, and Stillwagoner trying to convince him otherwise. At this point, Rhodes was in his vehicle with the driver's side door open and Neal and Swartz were standing inside the swing of the door with Stillwagoner at its perimeter. After some argument, Rhodes - abruptly and without warning - shoved his pickup into reverse, stomped on the accelerator, and backed away at a high rate of speed with the door still open. Stillwagoner

was immediately knocked down. There is some evidence that Swartz and Neal, who were still within the swing of the door, initially attempted to hang on with Swartz being the first to lose his grip. Swartz fell under the door and was knocked unconscious. Neal, who was on the inside closest to Rhodes, may have attempted unsuccessfully to jump into the vehicle. In any event, he was dragged backward until the open door struck another parked vehicle as Rhodes' vehicle passed by it. Neal suffered traumatic head, neck, and abdominal injuries when he was crushed between the door and the second vehicle.

Several of the Willbros employees attempted to provide aid to Neal, but he was in extremely bad shape and was soon pronounced dead at the hospital in Watford City. The autopsy report states the time of injury was 3:30 a.m. and time of death was 4:14 a.m. (Doc. No. 31-51). The toxicology report revealed that Neal had a blood alcohol content of 0.144 g/100ml. (Doc. No. 31-52).

Rhodes did not stop after striking Neal and the other two Willbros employees. He was later arrested by law enforcement officers where he was staying in Watford City. When arrested, Rhodes claimed he did not know he had struck the Willbros employees given his intoxicated state and his shock over what had occurred, including Neal's death, appeared genuine according to the arresting officers. (Doc. No. 28-6). There is some evidence that the testing of a blood specimen obtained from Rhodes at 9:33 a.m., some six hours after leaving the RV park, revealed he still had a blood alcohol content of 0.115 g/100ml, but whether he had continued to drink after leaving the park cannot be determined from what has been submitted. (Doc. No. 31-48, pp. 4-5).

Rhodes was initially charged with one count of manslaughter, three counts of reckless endangerment, and one count of leaving the scene of an accident. All of the charges were later dismissed except for the charge of leaving the scene of an accident for which Rhodes received a one

year sentence of imprisonment with all but 90 days suspended and with the 90 days to be served in jail in Washington followed by five years of probation.

### D. Evidence of prior after-bar-closing parties at the RV park and alcohol consumption within the common areas

There is some evidence that the after-bar-closing party that occurred on the evening in question was not a one time occurrence. In particular, bartender Envid states in an affidavit that Willbros employees routinely invited people, including Eagles employees, to the RV park to continue drinking after the bar closed during the summer of 2012 and that she personally had been at the RV park after closing on several prior occasions for after-hours drinking. She further stated that there was a lot of drinking taking place at the Willbros RV park during the summer of 2012.

In addition, Lisa Kurgan, who resided in the park and who worked in the construction office doing administrative work that included accounting and clerical work for the park, was more equivocal, but gave testimony that could be viewed as confirming to some extent what Envid had to say:

> Q. All right. Okay. Is it unusual that on a work night they're outside drinking at 3:30 in the morning?
>
> A. I would say yes and no.
>
> Q. And it wasn't unusual, was it, for men to sit out all hours of the night drinking at the Willbros yard?
>
> A. I don't think – it certainly doesn't happen every single night. I think it was strange it was on a Monday.
>
> Q. Because it usually happens on a weekend –
>
> A. Yes.
>
> Q. -- where they stay out all night drinking beer and passing a bottle?
>
> A. Not all night and just hanging out drinking. I don't - -

Q.      Okay.

A.      - - think that anyone was passing a bottle.

(Doc. No. 28-7, pp. 14-15).

**E.      Lack of any regulation by Willbros of alcohol use within the park or prohibition of conduct fueled by excessive consumption of alcohol**

Willbros has a general policy prohibiting all use of alcohol on its property.  As discussed later, plaintiffs contend this necessarily applies to the RV park and that its lack of enforcement is evidence of negligence.

Willbros disagrees.  The area supervisor (who was immediately responsible for the RV park) and the company safety director have both testified that the general prohibition against alcohol use on company property would not extend to the RV park.  They contend this general policy, which predated the construction and operation of the RV park, was intended to cover only property where work was being performed.  And, consistent with this testimony is the fact that RV park rules do not prohibit the use of alcohol within the park and the lack of evidence of park tenants being told that the general prohibition against alcohol use on company property extended to the RV park.

On the other hand, there is no evidence that Willbros made any attempts to regulate excessive drinking, intoxication, or drunkenness within the park or to prohibit conduct that might result from such activity, *e.g.*, disorderly conduct, even though the park rules do contain other prohibitions that appear to be for tenant safety and peaceful enjoyment of the park, *e.g.*, the "no exceptions" 10 p.m. to 5 a.m. quiet-hours rule and the 10 m.p.h. speed limit - both of which may have been violated in this case.

## II.    DISCUSSION

### A.    Summary judgment standard

The standards for addressing motions for summary judgment are well known to the court and need not be repeated here.  E.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Barnhardt v. Open Harvest Co-op., 742 F.3d 365, 369 (8th Cir. 2014).

### B.    North Dakota law governing liability for negligence

Actionable negligence under North Dakota law "consists of a duty on the part of an allegedly negligent party to protect the plaintiff from injury, a failure to discharge that duty, and a resulting injury proximately caused by the breach of the duty."  Saltsman v. Sharp, 2011 ND 172, ¶ 7, 803 N.W.2d 553 (internal quotations and citing authority eliminated) ("Saltsman").

Duty is generally a question of whether the relationship between the person alleged to be negligent and the injured party created a legal duty of care.  E.g., Azure v. Belcourt Pub. Sch. Dist., 2004 ND 128, ¶ 9, 681 N.W.2d 816; see also Hoff v. Elkhorn Bar, 613 F. Supp. 2d 1146, 1155 (D.N.D. 2009).  Preliminarily, the question is one for the court.  However, if determining whether a duty existed in a particular situation depends upon resolving factual issues, the facts must be resolved by the trier of fact unless the court concludes that reasonable persons could reach only one conclusion from the disputed facts.  Saltsman, 2011 ND 172 at ¶¶ 11, 15-16.

Given the breadth of the duty of care (which generally requires the taking of reasonable measures to prevent injury), the other two elements of negligence (*i.e.*, whether the duty was breached and whether the resulting injury was proximately caused by the breach) are almost always questions for the jury if one has been demanded, save for extreme cases.  See, e.g., Botner v. Bismarck Parks and Recreation Dis., 2010 ND 95, ¶¶ 8-19, 782 N.W.2d 662 ("Botner"); Makeeff

v. City of Bismarck, 2005 ND 60, ¶¶ 12-27, 693 N.W.2d 639.  As a consequence, summary judgment is ordinarily inappropriate in negligence actions under North Dakota law.  Id.

### C.    Discussion

Defendants make several arguments for why they are entitled to summary judgment of dismissal as a matter of law.  These will be addressed in turn.[2]

> **1.    Defendants' argument that Willbros in its capacity as a landlord owed no duty to protect Neal from the conduct of Rhodes**

Defendants argue that the relationship between Willbros and Neal as it relates to the RV park was one of landlord-tenant and that it owed no duty to Neal as a consequence.  In support, defendants cite to the North Dakota Supreme Court's decision in Bellemare v. Gateway Builders, Inc., 420 N.W.2d 733 (N.D. 1988).  In Bellemare, the North Dakota Supreme Court recognized the general common law rule that landlords have no liability to their tenants or other entrants for injuries due to dangerous conditions on the leased premises.

The flaw in this argument, however, is that the actions of Rhodes causing Neal's death occurred in an area of the RV park that, from all appearances, was within the retained control of Willbros.  At least with respect to such areas, the North Dakota Supreme Court has concluded that ordinary rules of premises liability apply, even with respect to someone who is a tenant.  Gonzalez v. Tounjian, 2003 ND 121, ¶¶ 9-12, 665 N.W.2d 705 (citing Restatement (Second) of Torts § 360 (1965) with respect to a claim by a tenant for injuries suffered as a result of an allegedly defective condition in a common area over which the landlord retained control); see Saltsman, 2011 ND 172

---

[2] Defendants have not argued what, if any, are the consequences of the language in the rental agreement that "Willbros is not responsible for property damage or injuries incurred on the premises."  Consequently, the court expresses no opinion on the subject.

at ¶¶ 10-20 (owner of an apartment complex owed duty of care to a lawful entrant upon areas where the owner retained control of the premises); <u>see also</u> NDJI Civil C-17.00.

### 2. Defendants' argument that no duty was owed because Rhodes' "criminal attack" was not foreseeable

#### a. Introduction

Defendants next argue that landlords owe no duty to protect tenants from criminal attacks by third persons. However, as already noted, the conduct in question occurred within the area where Willbros appears to have retained control. Hence, the focus for determining what duty is owed is not upon Willbros's status as a landlord but rather upon its status as the landowner or possessor of the land.

But even with this correction, defendants' no-duty-for-criminal-attack argument too narrowly characterizes what the jury might conclude took place. While the jury might conclude that Rhodes intended to strike Neal with his vehicle, there is also evidence from which the jury could conclude Rhodes was so intoxicated that he was oblivious to the likelihood of the three Willbros employees being struck and that his conduct was the result of his being highly intoxicated. Consequently, the issue for purposes of foreseeability is not just whether intentional assaultive behavior was foreseeable but also whether grossly negligent or even reckless driving caused by alcohol intoxication was foreseeable.[3]

---

[3] While the prosecutors faced a higher burden (*i.e.*, proving guilt beyond a reasonable doubt), it is somewhat noteworthy that they elected not to proceed with any charge where intent to commit an injury was an element and even dismissed the charges of reckless endangerment.

### b.    North Dakota case law

The role that foreseeability should play in making a no-duty determination remains controversial, with some states and the Restatement (Third) of Torts taking the position that foreseeability should no longer be used in deciding whether a duty is owed but rather should be restricted to determining whether the duty was breached, where it is also an element. E.g., Hoyt v. Gutterz Bowl & Lounge L.L.C., 829 N.W.2d 772, 775-77 (Iowa 2013); Gipson v. Kasey, 150 P.3d 228, 231 (Ariz. 2007); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 cmts. i & j (2010). The significance of this distinction, at least in most cases, is who decides foreseeability - the court or the jury. In other words, if the question of foreseeability is reserved to whether the duty was breached, then it is one for the jury- subject to the court being able to decide in extreme cases that no reasonable juror could conclude the duty was breached. See id.

The question of what duty a possessor of land owes to a lawful entrant with respect to the danger of willful conduct of others, and the extent to which foreseeability should play a role in that analysis, appears to be uncertain under North Dakota law. So far, the question has been addressed primarily in the context of claims made against bars for assaults upon lawful entrants.

The question of what duty a bar owner owes to a lawful entrant appears to have first arisen in Zueger v. Carlson, 542 N.W.2d 92 (N.D. 1996), where a patron sued the owner of the bar for injuries sustained as a result of an assault by one of the bar's off-duty bouncers. One of the plaintiff's claims was that the bar owner had a duty under general premises liability law to provide adequate security. In reversing the trial court's dismissal of this claim, the court concluded that "a bar or night club owner owes a duty to its patrons to protect them from assault by other patrons when the owner has reasonable cause to anticipate conduct on the part of third persons which is likely to

13

endanger the safety of patrons." Id. at 97. In reaching this conclusion, the court cited cases where other courts had reached the same result as well as the Restatement (Second) Torts § 344 (1965), including comment *f*. Id. at 96-97. As explained in comment *f*, the Restatement (Second) of Torts took the position that a possessor of land has a duty to protect visitors from third party conduct where the possessor knows or has reason to know of a likelihood of third party conduct that could endanger visitors[4] or where the character of the business or the possessor's past experiences were such that the possessor should reasonably anticipate careless or criminal conduct by third parties.

Notably, while the court in Zueger addressed only the liability bar owners, the Restatement (Second) of Torts § 344, upon which it in part relied, is not so limited and extends to any possessor of land operating a business. Also, as explained in comment *f*, foreseeability appears to be a primary element in the determination of duty.

More recently, the North Dakota Supreme Court again addressed the duty of a bar to a lawful entrant who was assaulted. In this case, the claim was brought by a guest attending a private party for injuries sustained as a result of an assault by an obviously intoxicated patron. Forsman v. Blues, Brews and Bar-B-Ques, Inc., 2012 ND 184, ¶¶ 13-14, 820 N.W.2d 748 ("Forsman"). The court stated:

> [¶ 12] Forsman also argues the district court erred in granting judgment as a matter of law on her premises liability claim under N.D.C.C. § 9-10-06, which requires a person to exercise ordinary care or skill in the management of the person's property.
> [¶ 13] Under our comparative fault law in N.D.C.C. ch. 32-03.2, "negligence remains a separate theory from dram shop liability" with different elements of proof. Stewart, 520 N.W.2d at 46. "An actionable negligence consists of a duty on the part of an allegedly negligent party to protect the plaintiff from injury, a failure to discharge that duty, and a resulting injury proximately caused by the breach of the duty." Saltsman v. Sharp, 2011 ND 172, ¶ 7, 803 N.W.2d 553 (quoting Botner v. Bismarck Parks & Recreation Dist.,

---

[4] North Dakota no longer recognizes separate duties to lawful entrants of property depending upon their status.

14

2010 ND 95, ¶ 10, 782 N.W.2d 662). "Generally, the existence of a duty is a preliminary question of law for the court to decide." Saltsman, at ¶ 11 (quoting Botner, at ¶ 10). Under N.D.C.C. § 9-10-01, "[e]very person is bound without contract to abstain from injuring the person or property of another or infringing upon any of that person's rights." "A person is responsible . . . for an injury occasioned to another by the person's want of ordinary care or skill in the management of the person's property or self." N.D.C.C. § 9-10-06. "Under premises liability law, landowners owe a general duty to lawful entrants to maintain their property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to another, the seriousness of the injury, and the burden of avoiding the risk." Saltsman, at ¶ 11 (quoting Botner, at ¶ 9). "If a landowner permits dangerous conditions to exist on the premises the landowner must take reasonable measures to prevent injury to those whose presence on the property reasonably can be foreseen." Saltsman, at ¶ 11 (quoting Fast v. State, 2004 ND 111, ¶ 8, 680 N.W.2d 265). "The owner of any property must use it with an ordinary degree of care so as not to damage others, exercising caution and reasonable care under the circumstances." Saltsman, at ¶ 11 (quoting Doan v. City of Bismarck, 2001 ND 152, ¶ 25, 632 N.W.2d 815).

[¶ 14] Those principles establish a duty of care for premises liability, and on the record in this case, we decline to hold as a matter of law that Forsman failed to establish a breach of that duty by Muddy Rivers. On remand, Forsman may pursue her negligence claim for premises liability.

Forsman, 2012 ND 184 at ¶¶ 12-14.

Of particular note in Forsman is the fact that there is nothing in the court's discussion which suggests that the principles it applied with respect to the risks of criminal attack (particularly a criminal attack by an obviously intoxicated person) would be limited to possessors of land who are bar owners. Also, in stating what duty was owed, the court referenced North Dakota's "general duty" statutes, N.D.C.C. §§ 9-10-01 and 9-10-06, and then went to state that the duty was to keep the premises in a reasonably safe condition "in view of all of the circumstances" to include not only the "likelihood of injury to another" (i.e., foreseeability) but also the "seriousness of the injury" and the "burden of avoiding the risk," citing Saltsman, which, although a premise liability case, did not involve third party conduct.

In deciding in Forsman that the duty of a landowner (at least one operating a commercial enterprise) with respect to the risk of danger created by an obviously intoxicated person was the general duty to keep the premises in a reasonably safe condition, the court did not make explicit

whether the trial court should simply instruct on the general duty and leave it to the jury to consider the other factors it mentioned (*i.e.*, the foreseeability of the risk of injury, the seriousness of the harm, and the burden of avoiding the risk) or whether a trial court must initially consider for itself the factors and decide whether a duty was owed as a matter of law in a particular case. What suggests it may be the former is not only the court's explicit reference in <u>Forsman</u> to the two "general duty" statutes, but also the fact that, in other premises liability cases where the court has made reference to the same factors of likelihood of injury to another, seriousness of the injury, and burden of avoiding the risk, the court has stated it was applying general negligence principles and has discussed foreseeability in relation to whether or not the jury could have concluded the duty was breached. <u>E.g.</u>, <u>Schmidt v. Gateway Community Fellowship</u>, 2010 ND 69, ¶ 8, 781 N.W.2d 200 ("Under North Dakota law for premises liability, general negligence principles govern a landowner's duty of care to persons who are not trespassers on the premises."); <u>O'Leary v. Coenen</u>, 251 N.W.2d 746, 752-53 (N.D. 1977) (whether the attack of a postman by a farm dog was foreseeable and what the landowner could possibly have done to alleviate the danger were questions for the jury); <u>see</u> <u>also</u> NDJI-Civil C-17.08.

### c. The duty owed by Willbros in this case

Based on the foregoing, the court believes the North Dakota Supreme Court would conclude that the duty Willbros owed to Neal and the other tenants of the RV park with respect to the dangers created by Rhodes' conduct (even if he intended to assault Neal with his vehicle) is the general duty of a possessor of land to exercise due care to protect lawful entrants from an unreasonable risk of harm under N.D.C.C. §§ 9-10-01 & 9-10-06 since Rhodes' conduct occurred within the common

areas and the activity Willbros was conducting on the premises was a commercial enterprise.[5] To the extent the court is required to consider the other factors in deciding whether Willbros owed a duty in this particular case (as opposed to simply letting the jury consider the factors in deciding whether the general duty of due care was breached), the court believes (and reasonable jurors could conclude): (1) the risk of obviously intoxicated persons committing willful assaults or driving within the park in negligent fashion was foreseeable for the reasons expressed below; (2) the risks of possible injury were substantial; and (3) there were some things Willbros might have done that would not have been unduly burdensome.

### 3. Defendants' argument that no reasonable jury could conclude that any duty owed to Neal was breached

#### a. Alleged lack of foreseeability

Defendants argue that Rhodes' criminal attack was not foreseeable because there is no evidence of any prior altercations within the RV park, much less evidence that Willbros was put on notice of the likelihood of such acts. However, as already noted, the jury could conclude that Rhodes had not intended to assault Neal, so the issue for foreseeability is not just whether an intentional assault was foreseeable but also whether grossly negligent and reckless driving caused by alcohol intoxication was foreseeable.

In this case, there is some evidence from which a jury could conclude that Willbros either knew or should have known of the potential for tenants and visitors being in a drunken and intoxicated condition within the park's common areas (including driving while intoxicated) as a result of late evening "partying" by groups of individuals, such as occurred on the night in question.

---

[5] Having reached this conclusion, the court need not decide whether the employer-employee relationship also created a duty given the fact that the RV park was employer-sponsored housing.

And that this might lead to injury to tenants or other lawful entrants is well within the common knowledge and experience of the jurors.[6] See Forsman, 2012 ND 184, at ¶¶ 7, 12-14 (implicitly concluding that the possibility of an extremely intoxicated person injuring a lawful entrant, including committing an assault, was foreseeable to the landowner); Stewart v. Ryan, 520 N.W.2d 39, 48-49 (N.D. 1994) (foreseeability of an obviously intoxicated individual shooting the decedent was a question for the jury even in the absence of evidence that the individual exhibited violent propensities beforehand); Slaubaugh v. Slaubaugh, 466 N.W.2d 573, 578 (N.D. 1991) (recognizing the foreseeability of an intoxicated person driving unsafely by the statement: "A venerable maxim tells us: 'A drunken man is as much entitled to a safe street, as a sober one, and much more in need of it.' Robinson v. Pioche, Bayerque & Co., 5 Cal. 460, 461 (1855)."); cf. Nelson v. Gillette, 1997 ND 205, ¶¶ 45-47, 571 N.W.2d 332 (discussing the foreseeability of the risks of harm in cases where, arguably, it was less apparent than here). Also, the lack of a specific incident of a prior assault or driving while intoxicated is not dispositive, although it is a factor the jury can consider. See id.; cf. Botner, 2010 ND 95 at ¶¶ 9-13.[7]

_____

[6] As noted earlier, Charles Burgess was an eyewitness to both the beginning of the party as well as Rhodes later striking the three Willbros employees with his vehicle. In the context of opining that Rhodes was so intoxicated he did not know what he was doing, Burgess offered the following observation:

> Second of all, when you get a bunch of clowns out there drinking and it goes too far, too late, things do end up happening, unfortunately.

(Doc. No. 31-53, p. 58).

[7] In Botner, a child slipped on a high-dive board at a public pool and fell onto the concrete deck below. In a suit brought to recover for the child's injuries, one of the arguments made was that the diving board was unsafe because the side rails did not extend out over the edge of the pool. In addressing the park board's argument that there was lack of notice of any such defect because the diving board been used since 1953 without a major incident, the court stated:

> [¶ 12] While evidence of the diving board tower's long-standing, injury-free use is relevant to whether Bismarck Parks maintained its property in a reasonably safe condition, it does not conclusively prove Bismarck Parks met its duty of care. "[I]rrespective of a long history free from accidents," the likelihood of injury is determined at the time an accident occurs. Henricksen v. State, 319 Mont. 307, 84 P.3d 38, 46 (2004). In addition, the likelihood of injury is just one of several considerations used to determine whether Bismarck Parks acted reasonably under the circumstances.

(continued...)

### b. Defendants' argument they were not required to provide security

Defendants also argue that Willbros was not required to provide on-site security within the RV park to protect against what happened.   Implicit in their argument is the suggestion this would have been the only thing that might have prevented what occurred.

In response, plaintiffs have not contended defendants were required to provide on-site security.   Rather, they contend defendants should have taken action to curb the excessive use of alcohol with their primary argument being that defendants should have enforced Willbros's general policy prohibiting all consumption of alcohol on its property.   While the court has substantial doubts about whether this policy extended to the RV park (given that no work was being done there, the fact the park rules mention no such prohibition, and the lack of evidence that the RV tenants were told the policy applied to the park), the court need not decide now whether it will allow plaintiffs to present evidence of the policy.   This is because a jury might conclude there were other things Willbros could reasonably have done.

In particular, the jury could conclude that Willbros initially, or at least later when it knew or should have known of the likelihood of late-night partying and drinking that was likely to lead to persons being in an intoxicated and drunken state - assuming the jury so finds, could have enacted a park policy prohibiting intoxication and drunkenness within the park, which necessarily would also have prohibited driving while intoxicated within the park.   Further, the jury could conclude the

---

[7](...continued)
See Groleau, 2004 ND 55, ¶ 16, 676 N.W.2d 763 ("Under premises liability law, landowners owe a general duty to lawful entrants to maintain their property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to another, the seriousness of the injury, and the burden of avoiding the risk.").
2010 ND 95 at ¶¶ 9-13.

presence of such a policy might have led to compliance by the tenants on the night in question (with the tenants in turn controlling the behavior of their guests) - particularly given the housing shortage. In addition, the jury might conclude that not only should Willbros have adopted such a policy, it should have occasionally checked for compliance.[8]

### 4. Defendants' argument that the only person who can be held responsible for Neal's death as a matter of law is Rhodes

Willbros argues the sole person responsible for Neal's death was Rhodes. However, there may be more than one proximate cause for an injury. The North Dakota Supreme Court recently addressed this point in <u>Saltsman</u>, <u>supra.</u>

In that case, plaintiff Saltsman was riding a bicycle on a sidewalk next to an apartment building and parking lot owned by Hasche. Lisa Sharp, traveling in her vehicle, exited the parking lot and stopped in the driveway across the sidewalk. Apparently, she did so because her view of traffic in the street and the sidewalk was obstructed by a fence installed by Hasche along the sidewalk. When Sharp unexpectedly pulled out and stopped, Saltsman collided with Sharp's vehicle. In reversing the trial court's dismissal of the case brought by Saltsman against Hasche, the North Dakota Supreme Court stated the following:

> [¶ 9] By its order, the district court considered Sharp the only negligent party, effectively concluding she was the only party who owed a duty of care, breached her duty, and was the sole cause of Saltsman's injuries. Based upon that conclusion, the district court only analyzed whether Hasche had a duty to protect Saltsman from Sharp's negligence, and the court failed to analyze whether both Hasche and Sharp owed Saltsman a duty of care. Sharp's alleged negligence does not necessarily negate Hasche's duty. More than one party may have owed a duty toward an injured party and may have been at fault in causing an injury. Under North Dakota's modified comparative fault law, negligence is included in the concept of "fault," and the fault of two or more parties may be compared so that each party is liable only for the amount of damages attributable to the percentage of fault by that party.

---

[8] There might have been other policies that Willbros could have adopted, such as limiting the manner or hours of consumption of alcohol within the common areas.

N.D.C.C. § 32-03.2-02. Even though Sharp and Saltsman settled their case and Sharp would not be a party at a trial, the fact-finder would determine the fault attributable to all tortfeasors, and Hasche would be responsible only for the portion of fault, if any, attributed to him. See Jones v. Ahlberg, 489 N.W.2d 576, 583 (N.D. 1992). The district court erred by deciding only whether Hasche had a duty to protect Saltsman from the negligence of Sharp and failing to analyze whether Hasche had a separate duty to avoid injury to Saltsman.

Saltsman, 2011 ND 172 at ¶ 9; see also Kimball v. Landeis, 2002 ND 162, ¶ 7, 652 N.W.2d 330 ("The negligence of two or more persons may contribute concurrently as the proximate cause of an injury, and to be a proximate cause of an injury, a person's conduct need not be the last cause nor the sole cause of an injury."); Slaubaugh v. Slaubaugh, 466 N.W.2d at 577-78 (where husband/driver and his wife/passenger were both intoxicated and drove through an unmarked T-intersection at an excessive rate of speed, wife was permitted to sue both her highly intoxicated husband and the county for failing to properly mark the intersection).

Also, the fact Rhodes' conduct may have been willful or criminal does break the chain of causation as a matter of law as indicated by the authority previously cited. In fact, under North Dakota's scheme for comparing fault, "willful fault" is compared with other types of statutorily defined fault, and the question of proximate cause is one for the jury unless reasonable minds could not differ. See, e.g., Stewart v. Ryan, 520 N.W.2d 39 (N.D. 1994) (whether gunman's subsequent criminal act was a superseding, intervening cause of plaintiffs' injuries was a question of fact that precluded summary judgment for purposes of comparing fault in a dramshop action); Champagne v. United States, 513 N.W.2d 75 (N.D. 1994) (suicide victim's fault was not an intervening superseding cause of any fault upon the treating doctor); McLean v. Kirby Co., 490 N.W.2d 229 (N.D. 1992) (vacuum cleaner salesman's rape of potential customer was not a superseding cause as a matter of law of the fault of the distributor employing the salesman); N.D.C.C. § 32-03.2-02 ("Under this section, fault includes negligence, malpractice, absolute liability, dram shop liability,

failure to warn, reckless or willful conduct, assumption of risk, misuse of product, failure to avoid injury, and product liability, including product liability involving negligence or strict liability or breach of warranty for product defect.").

Finally, although Neal was an active participant in the party as well as the argument with Rhodes immediately before being struck by Rhodes' vehicle, any assumption of risk or negligence on his part is fault the jury can consider in allocating fault among all the persons deemed to be at fault, including Rhodes.  Any fault assigned to Neal would proportionally diminish plaintiffs' recovery but would not bar it unless the amount of such fault was fifty percent or more of the combined fault of all persons whose fault contributed to Neal's injuries and death.  See e.g., Champagne v. United States, 513 N.W.2d at 76-77 (the fault of the decedent in a wrongful death action is compared pursuant to § 32-03.2-02 and is attributable those making a claim for wrongful death); Slaubaugh v. Slaubaugh,  466 N.W.2d 573 (wife who was a passenger in motor vehicle permitted to sue county for its alleged negligence in failing to properly sign the road despite her intoxication and her husband being highly intoxicated and driving at a high rate of speed); N.D.C.C. § 32-03.2-02 ("Contributory fault does not bar recovery in an action by any person to recover damages for death or injury to person or property unless the fault was as great as the combined fault of all other persons who contribute to the injury[.]").

### 5.    Liability of co-defendant Willbros Group, Inc.

Defendants argue that co-defendant Willbros Group, Inc. should be dismissed because it is a separate entity from Willbros and there is no evidence that it had any involvement in this matter. Defendants' argument appears to be well-taken, particularly given that it was Willbros that leased the land for its yard and RV park and owned and operated both.

III.    **ORDER**

Based on the foregoing, defendants' motion for summary judgment (Doc. No. 26) is

**GRANTED** with respect to the dismissal of Willbros Group, Inc. and **DENIED** as to the remainder

of the motion.

**IT IS SO ORDERED**.

Dated this 17th day of July, 2014.

*/s/  Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court
